# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY PETERS, Derivatively on Behalf of Nominal Defendant BLUE APRON HOLDINGS, INC., | Case No. |
| Plaintiff, | |
| v. | |
| MATTHEW B. SALZBERG, BRADLEY DICKERSON, BENJAMIN C. SINGER, JULIE M.B. BRADLEY, TRACY BRITT COOL, KENNETH A. FOX, ROBERT P. GOODMAN, GARY R. HIRSHBERG, and BRIAN P. KELLEY, | |
| Defendants, | |
| and | |
| BLUE APRON HOLDINGS, INC., | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

By and through his undersigned counsel, Plaintiff Jeffrey Peters ("Plaintiff") brings this stockholder derivative action on behalf of Blue Apron Holdings, Inc. ("Blue Apron" or the "Company") and against certain current and former officers and directors of the Company for violations of the Securities Act of 1933 (the "Securities Act").

Plaintiff makes these allegations upon personal knowledge as to those allegations concerning himself and, as to all other matters, upon the investigation of counsel, which includes without limitation: (a) review and analysis of public filings made by Blue Apron and other

related parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by certain of the Defendants (defined below) and other related non-parties; (c) review of news articles, stockholder communications, and postings on Blue Apron's website concerning the Company's public statements; (d) pleadings, papers, and any documents filed with, and publicly available from, the related consolidated securities fraud class action lawsuit captioned *In re Blue Apron Holdings, Inc. Securities Litigation*, Case No. 1:17-cv-04846-WFK-PK (E.D.N.Y.) (the "Securities Class Action"); and (e) review of other publicly-available information concerning Blue Apron and the Defendants.[1]

## I.  NATURE AND SUMMARY OF THE ACTION

1.  Plaintiff brings this action derivatively for the benefit of Nominal Defendant Blue Apron against certain of the Company's current and former executive officers and directors aiming to rectify Defendants' violations of the Securities Act for issuing false and misleading statements and/or omitting material information in the Company's documents in connection with its Initial Public Offering ("IPO") of Blue Apron common stock, which took place on July 5, 2017.

2.  Blue Apron is a subscription-based meal-kit delivery service. Blue Apron sends weekly boxes of pre-portioned ingredients with instructions for customers to cook meals at home.

---

[1] While Plaintiff's counsel has conducted its own, independent investigation, many of the allegations herein (and, in particular, the allegations that relate to former employees ("FE") accounts) are contained in a Amended Class Action Complaint for violation of the federal securities laws (the "Securities Complaint") filed against the Company and certain of its officers and directors in the Securities Class Action.

3.     Founded in 2012, Blue Apron is headquartered in New York, New York. Blue Apron's Class A common stock was offered in the IPO thereafter traded on the New York Stock Exchange ("NYSE") under the ticker symbol "APRN."

4.     Blue Apron's IPO was conducted pursuant to a registration statement (defined below as the "IPO Registration Statement") and prospectus (defined below as the "IPO Prospectus"). In the IPO Registration Statement and IPO Prospectus (collectively the "IPO Materials"), Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies. Defendants failed to disclose known material trends that would have a material impact on net sales or revenues or income from continuing operations and that would cause reported financial information not to be necessarily indicative of future operating results.

5.     Specifically, Defendants failed to disclose that by the time of the IPO: (i) Blue Apron was experiencing adverse On-Time In-Full ("OTIF") performance at its production facilities; (ii) significant delays had materialized in opening and ramping up production at the Linden, New Jersey facility; (iii) the adverse OTIF rates and delays at Linden were hindering the Company's customer retention and would necessarily delay the Company's announced plans to add new products, which would be essential to gain new customers and compete effectively in the marketplace; and (iv) because of the adverse OTIF rates and delays at Linden, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending until it could address its operational problems and improve its margins and OTIF rates.

6.     On August 10, 2017, in connection with the release of its second quarter earnings, Blue Apron revealed that it had encountered significant delays associated with ramping up

production in its highly-touted new factory in Linden, New Jersey. There were pervasive equipment malfunctions and serious staffing issues which prevented Blue Apron from attaining full production capacity at its Linden facility, which was ultimately intended to handle more than half of Blue Apron's total production.

7.    These persistent production delays led to additional delays in implementing new product initiatives, which the Company had hailed as crucial to customer growth and retention.

8.    Production delays also meant that the Company was forced to reduce its marketing spend, as there was no sense marketing to new customers it could not adequately service.

9.    Blue Apron also revealed in August 2017 that it was experiencing poor OTIF rates across its production locations, and most acutely at Linden. These problems likewise threatened Blue Apron's ability to attract and retain customers.

10.    Following this news, Blue Apron's share price fell $1.10, or more than 17%, to close at $5.14 on August 10, 2017—almost 50% below the IPO price.

11.    Blue Apron's stock price continued to slide well into November, as additional disclosures and analysis revealed to the market the full extent of Blue Apron's pre-existing and ongoing production struggles and the implications they portended for Blue Apron's business. Moreover, these developments and revelations arose at a most inopportune time as Blue Apron's competitors were gobbling up market share.

12.    By November 7, 2017, Blue Apron's share price had fallen to $3.05, nearly 70% below the IPO price.

13.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other shareholders have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

14.     Pursuant to 28 U.S.C. §1331 and section 21D of the Securities Act (15 U.S.C. § 77v), this Court has jurisdiction over the claims asserted herein under Section 11 of the Securities Act.

15.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

16.     Venue is proper in this Court in accordance with 28 U.S.C. §1391 because: (i) one or more of the defendants either resides in or maintains executive offices in this District; (ii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iii) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## III.    THE PARTIES

### A.    Plaintiff

17.     Plaintiff has been a stockholder of Blue Apron during the relevant period, and has continuously been a stockholder since that time.

**B.** **Nominal Defendant**

18.     Nominal defendant Blue Apron is a Delaware corporation. At the time of the IPO, Blue Apron maintained principal executive offices at 5 Crosby Street, New York, New York 10013. At all relevant times since approximately October 2017, Blue Apron has maintained principal executive offices at 40 West 23rd Street, New York, New York. Blue Apron's shares trade on the NYSE under the ticker symbol "APRN."

**C.** **Defendants**

19.     Defendant Matthew B. Salzberg ("Salzberg") was a co-founder of Blue Apron who served as the Company's President and CEO until November 2017, when he resigned and transitioned to the role of executive chairman. He also served as Treasurer until January 2017 and has been a director of the Company since its inception. Salzberg participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

20.     Defendant Bradley Dickerson ("Dickerson") was Blue Apron's President and Chief Executive Officer until April 2019. Dickerson joined the Company in February 2016. Dickerson participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

21.     Defendant Benjamin C. Singer served ("Singer") at all relevant times as the Company's Secretary and general counsel. Singer participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

22.     Defendant Julie M.B. Bradley ("Bradley") has been a Director of Blue Apron since November 2015. Bradley participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

23.     Defendant Tracy Britt Cool ("Cool") has been a Director of Blue Apron since January 2017. Cool participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

24.     Defendant Kenneth A. Fox ("Fox") was a Director of Blue Apron from April 2014 until February 2019. Fox participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

25.     Defendant Robert P. Goodman ("Goodman") was a Director of Blue Apron's Board from November 2015 until December 2019. Goodman participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

26.     Defendant Gary R. Hirshberg ("Hirshberg") has been a Director of Blue Apron's Board since October 2016. Hirshberg participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

27.     Defendant Brian P. Kelley ("Kelley") has been a Director of Blue Apron's Board since April 2017. Kelley participated in preparing the IPO Prospectus, and signed or authorized the signing of the IPO Registration Statement.

28.     Defendants Salzberg, Dickerson, Singer, Bradley, Cool, Fox, Goodman, Hirshberg, and Kelly are collectively referred to herein as the "IPO Defendants."

**D.     Related Party Non-Defendants**

29.     Non-Defendant Elizabeth Huebner ("Huebner") has been a Director of Blue Apron's Board since January 2020.  Huebner is included solely for demand futility purposes.

30.     Non-Defendant Linda Findley Kozlowski ("Kozlowski") has been Blue Apron's President, CEO and member of Blue Apron's Board of Directors since April 2019.  Huebner is included solely for demand futility purposes.

## IV.    FACTUAL BACKGROUND

### A.    Blue Apron's Meal Kits

31.    Blue Apron is a subscription-based meal-kit delivery service. The Company was founded in 2012 by Matthew Wadiak, Salzberg, and Ilia Papas, who "wanted to cook at home with their families, but they found grocery shopping and menu planning burdensome, time consuming, and expensive."

32.    Blue Apron's meal kits are available to customers through a weekly subscription service. Every week, the Company creates a number of original recipes, customers select which recipes they'd like to receive, and the Company delivers meal kits containing the recipes along with the pre-portioned ingredients required to cook them. According to Blue Apron, the Company's meal kits offer the satisfaction of home cooking along with the convenience of delivery, a wide variety of "seasonally-inspired recipes that are always delicious, fun and easy to prepare," and a regular introduction to "new ingredients, flavors, and cooking techniques"—in short, it's "like having your own private chef—you'll discover new recipes, eat fresher food, and save both time and money."

33.    Blue Apron's meal kits generated extensive media coverage and quickly became very popular. For example, *Forbes* aptly summarized Blue Apron's core value proposition, noting that the Company's "precisely portioned dinners minimize waste and allow consumers to try ingredients they might not otherwise buy, at a price they'd have trouble matching—roughly $10 per meal per person." [1]

### B.    Blue Apron's Business Model

34.    From the beginning, Blue Apron described its mission and business strategy as not just making home cooking easier but also transforming the nature of food distribution, which

purportedly allowed the Company to provide fresher and higher-quality ingredients at lower prices by increasing distribution and delivery efficiencies and reducing food waste. As early as September 18, 2012, Salzberg stated that Blue Apron's "food is a major differentiator for us" because "we source from the same wholesale providers who supply high-end restaurants, so the quality is extremely high…. In fact, our food is higher quality than you could get on your own at the supermarket, and fresher because it doesn't sit for a week on the supermarket shelf before you buy it."[2] And in numerous press releases beginning in April 2014, Blue Apron described itself as "reinventing the grocery supply chain from the farm to the dinner table," allowing it to "source top-quality, seasonal ingredients that are fresher and more affordable than customers can get on their own at their local supermarket."

35.     In its IPO Prospectus, Blue Apron described its business model as follows:

> We have reimagined the traditional grocery business model and developed an integrated ecosystem that employs technology and expertise across many disciplines. Our supply-demand coordination activities—demand planning, recipe creation, recipe merchandising, and marketing—drive our end-to-end value chain. We gather and infer information about our customers' tastes, food preferences, and order behavior to forecast near-term and long-term demand. We also manage and influence demand, including through our content, proprietary software tools, and e-commerce experience. For example, our flexible recipe design process allows us to adjust recipes close to the time of delivery, enabling us to coordinate customer preferences with expected ingredient supply to help mitigate supply chain risks. Because our customers select recipes instead of specific ingredients, we can make adjustments while maintaining a consistent, high-quality customer experience. Our innovative direct-to-consumer business model enables us to:
>
> • eliminate middlemen and work in a direct, coordinated manner with our suppliers to reduce costs so we can make our products available affordably and at scale;
>
> • provide consumers with differentiated, specialty ingredients, many of which are not widely available and are exclusive to us;

- 9 -

- develop and implement proprietary technology across our fulfillment operations to effectively manage our frequently changing, high- throughput, perishable inventory; and

- design and optimize a cost-effective delivery network capable of reaching over 99% of the U.S. population.

36. *Buzzfeed*[2] aptly summarized both the appeal of Blue Apron's business model as well as the sheer operational and logistical complexity necessary to pull it off:

The idea, on its surface, is simple. Once a week, customers receive a box in the mail with recipe cards and all the pre-portioned, farm-fresh ingredients — down to tablespoonfuls of vinegar and sprigs of oregano — needed to make two, three, or four wholesome, healthy, Instagram-ready, home-cooked meals. The cost per plate is just under $10, and each meal takes an average of 35 minutes to prepare (or so the recipe cards claim). As the sales pitch goes, it's healthier than takeout, easier than cooking from scratch, and cheaper than a private chef or meal delivery service. Blue Apron's product is, essentially, hired help in the kitchen at a fraction of the cost — a way for busy professionals and rural foodies to whip up meals like skokichi squash ragù and mafalda pasta with mushrooms, garlic chives, and rosemary or crispy catfish with kale-farro salad and warm grape relish in less than an hour, without setting foot in a grocery store or planning a meal. Its popularity has made the company a rising star among a new class of Silicon Valley disruptors whose product is not software, but real-world products, delivered to your door frictionlessly, quickly, efficiently, and sometimes inexpensively, with just a few clicks of a mouse or taps of an app.

\* \* \*

But between farm and front door is the massive, mostly invisible process by which all those ingredients are measured, cut, prepped, bagged, packed, palletized, and shipped. For all its outward simplicity, **Blue Apron's business model is predicated on a hugely complicated feat of precision logistics, executed at an enormous volume**. Each week, the company has to develop 10 original, relatively healthy, widely appealing, geographically and seasonally appropriate recipes that can be prepared easily and quickly, with ingredients that are affordable and available at scale. It has to source correct quantities of produce, meat, cheese,

---

[2] Caroline O'Donovan, *The Not-So-Wholesome Reality Behind The Making of Your Meal Kit*, Buzzfeed (Oct. 2, 2016, at 11:45 a.m.), https://www.buzzfeed.com/carolineodonovan/the-not-so-wholesome-reality-behind-the-making-of-your-meal.

bread, spices, and staples from "artisanal purveyors and hundreds of family-run farms" across the country. And then it has to precisely portion and package each of those ingredients — 10 to 12 per meal in this week's boxes — and send them out to hundreds of thousands of people, ideally without breakage, spoiling, lost packages, or missing ingredients.

37.     As *Buzzfeed* noted, the business model gave Blue Apron very little room for error in its operations:

> Flexibility and convenience are central to the Blue Apron pitch: Boxes can be canceled or modified up to about a week before the delivery day. That's a boon for the customer, but it makes sourcing difficult, especially for a company mission-driven to reduce waste. ***With hundreds of thousands of people expecting dinner to be delivered on time, there's little margin for error.***

38.     Because of this, Blue Apron's executive management had to be extremely involved in the details of the Company's operations. Therefore, "[f]rom the beginning Salzberg decided Blue Apron would handle its own distribution and stagg centers with employees, taking on early complications and costs to control quality."[3]

C.     **Blue Apron's Rapid Growth**

39.     Blue Apron has grown exponentially since 2012. In August 2012, Wadiak, Salzberg, and Papas packed and shipped the first 30 orders themselves, working from a commercial kitchen in Long Island City. By August 2013, the Company was delivering 100,000 meals per month. That number rose to 500,000 by March 2014; to 1 million by November 2014; to 3 million by June 2015, when the Company began shipping to the entire contiguous United States; to 5 million by October 2015; and to 8 million by October 2016.

---

[3] Alex Conrad, *Blue Apron's Got Big Plans For Dinner -- But So Do Its Hungry Rivals*, Forbes (Oct. 14 2015 9:45 a.m.), https://www.forbes.com/sites/alexkonrad/2015/10/14/inside-blue-apron-and-the-meal-kit-rush/#602294516461.

40.    To grow this quickly, the Company has spent very aggressively and scaled its operations incredibly rapidly. It opened a fulfillment center in early 2014 in Richmond, California; another fulfillment center, ten times as large, in December 2014 in Jersey City, New Jersey; and a third fulfillment center in June 2015 in Arlington, Texas.

41.    For the first few years, Blue Apron financed its rapid growth by raising funds from private investors. In April 2014, it raised $50 million from investors at a $500 million valuation. In June 2015, it closed a $135 million round of funding at a valuation of $2 billion. In the Company's June 9, 2015 press release announcing the funding round, it stated that it "will use the new capital to scale its rapidly growing network of farms, suppliers, and fulfillment capabilities throughout the country" and that the Company was "developing custom fulfillment software tools and investing in automation" and that these "new capabilities will be deployed across Blue Apron's network of fulfillment centers."

**D.    Blue Apron's IPO**

42.    By September 2016, Blue Apron was considering a public offering and had begun interviewing potential underwriters, targeting a valuation of $3 billion.

43.    From 2012 to 2016, Blue Apron had consistently maintained a significantly higher market share than any of its competitors, which included companies like Plated and HelloFresh. In September 2016, Blue Apron's market share was 57%.[4] But by September 2016, competition had grown increasingly stiff, causing Blue Apron's revenue growth to stall.

---

[4] Rani Molla, *Blue Apron still dominates the market for meal delivery kits but its market share is plummeting*, Recode (Nov 1, 2017, 10:30am EDT), https://www.recode.net/2017/11/1/16581142/blue-apron-market-share-decline-meal-kit-delivery-hello-fresh.

44.     Therefore, in the third quarter of 2016, the Company "increased promotional activity, including discounts to new customers, in part in response to increased competitive promotional activity." But because Blue Apron's competitors did the same, all of this price competition made it easy for potential customers to switch frequently in order to take maximum advantage of all the promotional pricing.

45.     In December 2016, the Company decided to delay its planned offering because it needed to show stronger performance in order to support a $3 billion valuation. Investors were particularly concerned about Blue Apron's margins and its cost of acquiring customers.

46.     In 2017, Blue Apron began spending even more aggressively on growth. As a result, in the first quarter of 2017, the Company generated revenue of $244.84 million but had a net loss of $51.68 million in the quarter—almost as much as it had lost in all of 2016.

47.     On March 31, 2017, Blue Apron filed a draft registration statement and preliminary prospectus. The registration statement was subsequently amended several times, with the final amended registration statement filed and declared effective on June 28, 2017 (collectively, the "IPO Registration Statement"). The final prospectus (the "IPO Prospectus") was filed on June 29, 2017.

48.     In the Company's amended preliminary prospectus filed on June 19, 2017, the Company marketed 30 million shares and "estimated that the initial public offering price per share will be between $15.00 and $17.00." This would have raised $450-$510 million and valued the Company at up to $3.2 billion.

49.     However, investors were less than enthusiastic, and the Company was forced to reduce its price to $10 per share. The Wall Street Journal[5] explained some of investors' concerns about the Company:

> Potential IPO investors expressed concern about Blue Apron's prospects for profitability, according to fund managers and analysts. The company's revenues have been growing, but it has posted net losses each year since its inception, and those losses have been growing. Marketing costs as a percentage of revenue has also climbed in recent years. In the first quarter, marketing costs rose to 25% of revenues, up from 15% a year earlier.
>
> Blue Apron's disclosures show its cash on hand is shrinking. It tapped Fidelity for $64 million of additional financing in May at its 2015 share price, an unusual move so close to an IPO.
>
> "It's hard to see what the bull case is," said Sean Stiefel, portfolio manager at Navy Capital LLC. Mr. Stiefel's firm participated in recent IPOs by social-media company Snap Inc. and enterprise software companies Appian Inc. and Okta Inc.
>
> Peter Lee, a data scientist at Triton Research LLC, which analyzes pre-IPO companies, said that Blue Apron will likely impress some investors with its consistent revenue growth, but it's unclear how it will transform into a company with strong profit margins given the complexity of food distribution and lack of customer loyalty.
>
> Daniel McCarthy, a professor of marketing at Emory University, analyzed Blue Apron's numbers and estimated that roughly 60% of customers stop using the service after six months.

50.     On July 5, 2017, the Company completed its IPO, selling 30 million shares of Class A common stock at $10.00 per share. The Company' received approximately $278 million in net proceeds from the IPO.

## V.     BLUE APRON'S UNDISCLOSED OPERATIONAL STRUGGLES

---

[5] Corrie Driebusch & Eliot Brown, *Blue Apron, Struggling to Woo Investors, Lowers Price Range for IPO*, Wall. S. J. (Jun. 28, 2017 5:12 p.m. ET), https://www.wsj.com/articles/blue-apron-chops-its-ipo-price-range-1498652104.

51.     Unbeknownst to the investing public, Blue Apron was struggling with operational issues beyond what investors were being told at the time of the IPO.

52.     Blue Apron had scaled its operations very quickly in order to maintain its rapid growth. In 2014 and 2015 it opened three new fulfillment centers in Richmond, California, Jersey City, New Jersey, and Arlington, Texas. At the end of 2014, Blue Apron had 1,051 full-time employees; that number increased to 2,997 by December 31, 2015 and to 5,028 by December 31, 2016.

53.     The rapid scaling created significant problems. For example, on October 2, 2016, *Buzzfeed* reported numerous problems at the Company's Richmond, California fulfillment center. Blue Apron had "had to rapidly hire a massive unskilled workforce" in order to ramp up its operations to meet demand, but was "unprepared to properly manage and care for those workers, and as a result has suffered a rash of health and safety violations." Moreover, while Blue Apron was not the "only meal-kit business bringing the on-demand model and venture-backed expectations to warehouses and food processing plants", it was "the only major player with such a history of health and safety problems."[6]

54.     These operational problems forced Blue Apron to slow its growth and to limit its marketing efforts until it could address its operations. Specifically, in October 2015, the Company hired a new safety manager for its Richmond center and "closed many shipping days to new customers, cut its marketing budget, turned off its referral program, and altered many of

---

[6] Caroline O'Donovan, *The Not-So-Wholesome Reality Behind The Making of Your Meal Kit*, Buzzfeed (Oct. 2, 2016, at 11:45 a.m.), https://www.buzzfeed.com/carolineodonovan/the-not-so-wholesome-reality-behind-the-making-of-your-meal.

its email marketing programs designed to drive customer orders until appropriate staffing was able to be put in place."[7]

55.     Blue Apron claimed to have learned from these problems and addressed its operations. In October 2016, Blue Apron told *Buzzfeed* that it had "learned from the operational challenges during its early days in Richmond" and that it was "proud of the culture, processes, and workplace that exist there today, as well as throughout the country."[8]

56.     In the meantime, Blue Apron also kept scaling its operations and trying to develop more advanced manufacturing capabilities that would allow it to offer more flexible product offerings.

57.     In 2016, Blue Apron started building two new fulfillment centers in Linden, New Jersey and in Fairfield, California. Blue Apron announced these two new fulfillment centers in a press release on February 6, 2017. The press release stated that the Company was "expanding its fulfillment operations in New Jersey with the opening of a new 495,000 square foot fulfillment center in Linden" where it "expect[ed] to employ over 2,000 people." The press release continued:

> "We're excited to be expanding our presence in New Jersey and bringing full-time jobs to the Linden community. Our new fulfillment center will help improvethe efficiency and capacity of our operations to meet strong customer demand," said Matt Salzberg, Blue Apron co-founder and CEO.
>
> The ***Linden facility will be outfitted with state-of-the-art technology*** and a variety of employee amenities. The fulfillment center is currently under construction and slated to officially open for production later this year.

---

[7] *Id.*

[8] *Id.*

"We are thrilled that Blue Apron is investing in Linden with its new facility," said Linden Mayor Derek Armstead. "The company's decision to come here will be a boost for our local economy, providing much needed jobs to our area. We look forward to having Blue Apron as a partner in our community."
Blue Apron currently operates fulfillment centers in Jersey City, NJ, Arlington, TX, and Richmond, CA. *In addition to its new Linden facility, the company also plans to open a new fulfillment center in Fairfield, CA in 2018.*

58.     As *Bloomberg* later reported, leading up to the IPO, a "key part of the pitch to Wall Street was the new fulfillment facility in Linden, New Jersey. Equipped with automated machinery that can get boxes out the door more quickly and reduce human error, the facility was supposed to handle more than half of all production."[9] However:

> Behind the scenes, however, all was not well. *A new fulfillment center was months behind schedule and still wasn't ready for prime time six weeks before the IPO*. The company had already postponed the listing once in case high marketing costs spooked potential investors. Losing money, Blue Apron was struggling to attract customers amid rising competition, risks it highlighted in a filing. *Still, executives and their advisers*, led by Goldman Sachs, Morgan Stanley, Citigroup and Barclays, *decided to proceed with an IPO*.

59.     Multiple former employees confirmed that, before the IPO, the Linden center was encountering major undisclosed problems, repeatedly delaying and disrupting its planned opening.

60.     The Linden facility began running into repeated delays in early 2017 due to construction and equipment issues. According to FE 1, these included problems with walk-in refrigerators and freezers (which, given Blue Apron's business, made up most of the facility), and problems with heating and air conditioning.

---

[9] Jing Cao & Alex Barinka, *How Blue Apron Wooed Then Disappointed Wall Street: Even as executives talked up the meal-kit business, they were battling operational issues*, Bloomberg (Dec. 6, 2017, 8:59 AM; corrected, Dec. 12, 2017, 9:06 AM), https://www.bloomberg.com/news/articles/2017-12-06/how-blue-apron-wooed-then-disappointed-wall-street.

61.     According to FE 4, Linden was so far behind schedule that, by the time it finally shipped its first box, it should have been packaging between 5,000 and 6,000 meals each day. But because of Blue Apron's constant attempts to cut corners, equipment kept breaking and the facility struggled to ramp up production.

62.     According to FE 5, the construction of Linden's assembly lines was significantly behind schedule, particularly with regard to key electrical components, and Linden also had ongoing issues running power to the lines that caused significant delays.

63.     According to FE 8, the Company distributed flyers to all employees from mid-to-late 2016 through August 2017 regarding the delays at Linden. The fliers addressed the Company's constantly changing estimates of when employees would be able to start working at Linden. By the time of the IPO, Blue Apron had been issuing internal statements about the delays for months.

64.     Indeed, as FE 5 recalled, there were still delays at Linden when Blue Apron went public. The Company had trouble ramping up to the rate of production they were supposed to be at. According to FE 4, by mid-summer 2017, Linden was still experiencing the problems that had hampered production for months: equipment malfunctions, product shortages, and inexperienced workers.

65.     In addition, due to Blue Apron's heavy use of temporary non-unionized workers, union laborers began picketing outside the Linden facility in early 2017. According to FE 1 and FE 4, the labor protests were widely known within Blue Apron.

66.     FE 5 reported that job satisfaction among Blue Apron's factory workers was consistently low and employee turnover was consistently high. FE 4 also noted that Blue Apron's workforce was poorly trained and experienced constant turnover. Without a skilled,

trained and experienced workforce, hitting production targets was difficult, and in fact hitting production goals was the exception rather than the norm at the Linden facility. As FE 4 noted, the employees sent over by various temporary employment agencies were unfamiliar with and unable to operate the new machinery the Company had installed at the Linden plant, resulting in delays.

67.     Moreover, according to multiple former employees, the IPO Defendants were all very closely involved with the Linden facility and intimately familiar with the problems and delays.

68.     According to FE 3, the Company held weekly "All Hands" meetings which FE 3 attended, led by either Salzberg or Dickerson, where executives discussed trend lines and the challenges facing their business. Everyone at headquarters attended the meetings, and corporate employees who were stationed elsewhere joined in via video conference.

69.     FE 3, who worked at the Company's New York City headquarters, noted that Salzberg, Dickerson, Chief Operating Officer Matthew Wadiak, Chief Marketing Officer Jared Cluff, and Chief Technology Officer Ilia Papas were all very involved in day-to-day operations.

70.     According to FE 5, Salzberg and Wadiak visited the new facility in Linden at least once a month to observe construction progress and see how the targeted production ramp up was progressing; co-founder Ilia Papas visited also, but less frequently. FE 5 reported regularly walking the production floor at Linden with Wadiak during his visits, and it was clear from Wadiak's comments during their walks that he was aware the facility was not operating at target levels.

71.     FE 5 further reported that several Blue Apron directors also paid the Linden facility frequent visits. Senior Director of Operational Excellence Sergio Huerga visited regularly

to observe the progress the Linden crew was making toward ramping up to target production levels.

72.     According to FE 5, it was obvious based on the Linden facility's production numbers that the plant was struggling, and the directors and executives did indeed view those metrics during their visits. The ramp-up plan included quantity and timing goals for production, so it was evident from viewing the plant's actual numbers that the Company was not meeting those goals.

73.     According to FE 6, Blue Apron tracked Key Performance Indicators ("KPIs") at the warehouse each day, and he was required to submit daily reports on productivity. Among the KPIs were boxes-per-hour and labor-hours-per-box.

74.     According to FE 5, Blue Apron's fulfillment centers stayed on top of numerous metrics to evaluate their own performance. The metrics included overall performance, cost, quality, internal metrics reporting, efficiency of operations, and profitability of operations.

75.     FE 4 reported that OTIF performance was regarded as one of several key metrics the entire time he worked at Blue Apron.[10] The belief communicated to FE 4 by supervisors at Linden was that once the facility ramped up to full capacity and the staff grew accustomed to the new facility, then the metrics should improve.

76.     According to FE 2, customers regularly complained that their orders had been botched or were missing key condiments or spices. FE 4 also noted frequent issues with missing order items and, when that occurred, the time required to fix it placed a significant drag on

_____

[10] The Company later confirmed that it had consistently tracked its OTIF rates internally. For example, Salzberg stated on November 7, 2017 that Blue Apron had "been consistently tracking OTIF" and considered it to be "one of the key metrics we look at in terms of customer experience."

operations. The Company was experiencing challenges related to getting orders to customers in a timely manner throughout FE 4's tenure at Blue Apron.

77.     According to FE 7, Salzberg, Papas, and Wadiak were very involved in managing the Company's operations and they were always called on to weigh in on big decisions. The three founders were absolutely aware of the delays and disruptions at the Linden facility because according to FE 7, the delays were often discussed during operations meetings, which were held once every other month in Richmond, as well as during weekly operations calls. According to FE 7, all three founders participated in the operations calls. Salzberg almost always led the weekly operations conference calls and Wadiak was a regular participant. FE 7 reported that, in light of these repeated discussions at the meetings and conference calls in which he participated, the executives certainly knew about the delays, but were unable or unwilling to push back the IPO.

## VI.    MATERIALLY FALSE AND MISLEADING STATEMENTS IN THE IPO MATERIALS

78.     The IPO Registration Statement and IPO Prospectus were materially false and misleading in that they failed to "provide such other information that the registrant believes to be necessary to an understanding of its financial condition, changes in financial condition and results of operations" and to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations," as mandated by Item 303 of Regulation S-K (17 C.F.R. §229.303) and the SEC's related interpretive releases thereto.

79.     The Instructions to Item 303 further require that the Management's Discussion and Analysis of Financial Condition and Results of Operations "shall focus specifically on material events and uncertainties known to management that would cause reported financial

information not to be necessarily indicative of future operating results or of future financial condition."

80.     In particular, the SEC has clarified that "companies should identify and discuss key performance indicators, including non-financial performance indicators, that their management uses to manage the business and that would be material to investors."

81.     In violation of this requirement, Defendants failed to disclose known material trends that would have a material impact on net sales or revenues or income from continuing operations and that would cause reported financial information not to be necessarily indicative of future operating results, including that: (i) Blue Apron was already experiencing adverse OTIF rates; (ii) significant delays had already materialized in opening and ramping up production at the Linden facility; (iii) the already-materialized adverse OTIF rates and delays at Linden were hindering the Company's customer retention and would necessarily delay the Company's announced plans to add new products, which would be essential to gain new customers and compete effectively in the marketplace; and (iv) because of the already-materialized adverse OTIF rates and delays at Linden, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending until it could address its operational problems and improve its margins and OTIF rates.

82.     According to the IPO Prospectus, the Company's value proposition for stockholders had three components: "Scale and Growth", "Attractive and improving margins", and "Unit economics". Elaborating, the IPO Prospectus claimed that "[a]s we have improved our supply chain, we have achieved *attractive and improving margins*" and that the Company "anticipated declines in cost of goods sold as a percentage of net revenue" which "we expect to result in attractive lifetime customer values." Elsewhere in the IPO Prospectus, it also claimed

that the Company had "Attractive unit economics" and that "[a]s we have continued to scale our business, grow our direct supplier relationships, and introduce increased automation into our fulfillment centers, *we have become more cost efficient*."

83.     These statements were false and misleading because Defendants failed to disclose that (i) Blue Apron was already experiencing adverse OTIF rates; (ii) significant delays had already materialized in opening and ramping up production at the Linden facility; and (iii) due to the already-materialized adverse OTIF rates and the persistent delays at the Linden facility, the Company's unit costs had increased, margins had narrowed, and the Company had not become more cost efficient in its efforts to scale up—as the Company later admitted in August 2017.

84.     With respect to the Company's fulfillment centers, the IPO Prospectus stated:

*We are completing the build out of a new fulfillment center in Linden, New Jersey, which we have recently begun to utilize*, and have entered into a lease for another new fulfillment center in Fairfield, California, which is currently under construction. Upon completion of the build out, the new fulfillment center in Linden, New Jersey will occupy approximately 495,000 square feet of space pursuant to a lease expiring in August 2026 with an option to extend the term for two consecutive five-year periods. The new fulfillment center in Fairfield, California will occupy approximately 431,000 square feet of space pursuant to a lease expiring 126 months after the commencement date, which expiration is currently estimated to be in early 2028, with an option to extend the term for two consecutive five-year periods. *Upon completion of our new fulfillment centers in Linden, New Jersey and Fairfield, California, we anticipate that such fulfillment centers, together with our Arlington, Texas fulfillment center, will comprise our primary fulfillment operations for the foreseeable future*.

85.     This statement was false and misleading because it discussed the progress of construction at the Linden fulfillment center and claimed that the Company had "recently begun to utilize" it—creating the impression that construction and operational improvements at Linden were proceeding on schedule—but failed to disclose that (i) Blue Apron was already experiencing adverse OTIF rates; and (ii) significant delays had already materialized in opening and ramping up production at the Linden facility.

86.     The IPO Prospectus also stated:

If we do not have sufficient fulfillment capacity or ***experience problems or delays in fulfilling orders***, ***our customers may experience delays in receiving their meal deliveries, which could harm our reputation and our customer relationships and could materially adversely affect our business***, financial condition and operating results….

We have designed and built our own fulfillment center infrastructure, including customizing third-party inventory and package handling software systems, which is tailored to meet the specific needs of our business. Furthermore, we are expanding the use of automated production equipment and processes in our existing fulfillment centers and are incorporating automated production equipment and processes into our new Linden, New Jersey fulfillment center that we are in the process of building out. As we continue to add capacity, capabilities and automated production equipment and processes to our fulfillment centers, our fulfillment operations will become increasingly complex and challenging. Any failure to hire, train or retain employees capable of operating our fulfillment centers could materially adversely affect our business, financial condition and operating results. ***We also may be unable to procure and implement automated production equipment and processes on a timely basis, and they may not operate as intended or achieve anticipated cost efficiencies***. For example, suppliers could miss their equipment delivery schedules, new production lines and operations could improve less rapidly than expected, or not at all, the equipment or processes could require longer design time than anticipated or redesigning after installation, and new production technology may involve equipment and processes with which we are not fully experienced. ***Difficulties we experience in automating our fulfillment processes could impair our ability to reduce costs and could materially adversely affect our business, financial condition and operating results.***

87.     The IPO Prospectus also stated:

Developing and launching new product offerings or enhancements to our existing product offerings involves significant risks and uncertainties, including ***risks related to*** the reception of such product offerings by our existing and potential future customers, increases in operational complexity, ***unanticipated delays or challenges in implementing such offerings or enhancements***, increased strain on our operational and internal resources (including an impairment of our ability to accurately forecast demand and related supply) and negative publicity in the event such new or enhanced product offerings are perceived to be unsuccessful. We have scaled our business rapidly, and ***significant new initiatives have in the past resulted in, and in the future may result in, operational challenges affecting our business***.

- 24 -

88.     These statements were false and misleading because they portrayed these risks as purely hypothetical but failed to disclose that (i) Blue Apron was already experiencing adverse OTIF rates; (ii) significant delays had already materialized in opening and ramping up production at the Linden facility; and (iii) as a result, the specified risks such as "problems or delays in fulfilling orders" and "operational challenges" and a failure to "achieve anticipated cost efficiencies" had already materialized and were, in fact, "materially adversely affect[ing] our business," not merely "in the past" but also at present and continuing into the foreseeable future.

89.     The IPO Prospectus stated that the Company was focused on launching its new Linden fulfillment center and on launching its planned product expansion, and that it therefore expected operating expenses to decrease in the second quarter of 2017:

> In the second quarter of 2017, **_we expect to invest significantly less in marketing compared to the first quarter of 2017 due to the seasonal factors discussed above, the ongoing operational effort associated with launching our new fulfillment center in Linden, New Jersey, and our planned product expansion to offer greater flexibility in recipes_**. As a result, while we expect significant year-over-year net revenue growth from the second quarter of 2016 to the second quarter of 2017, we anticipate that our quarterly net revenue in the second quarter of 2017 will be modestly lower than the seasonally high level of net revenue in the first quarter of 2017, which decline **_will be more than offset by a reduction in our operating expenses_**, including a significant planned reduction in our marketing expenses due to our seasonal marketing strategies.

90.     This statement was false and misleading because it discussed the Company's "ongoing operational effort associated with launching our new fulfillment center in Linden, New Jersey, and our planned product expansion to offer greater flexibility in recipes" but failed to disclose that (i) Blue Apron was already experiencing adverse OTIF rates; (ii) significant delays had already materialized in opening and ramping up production at the Linden facility; (iii) the already-materialized adverse OTIF rates and delays at Linden would necessarily delay the Company's "planned product expansion"; and (iv) because of the already-materialized adverse

OTIF rates and delays at Linden, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending—not merely as part of "seasonal marketing strategies" but because it needed to address these already-materialized operational problems.

91.     The IPO Prospectus stated that part of the Company's growth strategy was to "expand our core product to fit more lifestyles," elaborating:

> As we expand our operational capabilities, increase the automation in our fulfillment centers, and grow our supplier network, we plan to expand our core product by offering greater flexibility in the number of recipes per order and greater diversity in the number of recipes from which customers may choose. In the future, we may introduce similar flexibility for wine. We are developing product expansion initiatives to fit the lifestyles of a broader customer set in order to continue to expand our addressable market and drive greater satisfaction among current customers, thereby increasing their Average Order Value and rate of Repeat Orders.

92.     This statement was false and misleading because Defendants claimed that the Company was "expand[ing] our operational capabilities" and "developing product expansion initiatives" but failed to disclose that (i) Blue Apron's operational capabilities were actually worsening because the Company was already experiencing adverse OTIF rates; (ii) significant delays had already materialized in opening and ramping up production at the Linden facility; and (iii) the already-materialized adverse OTIF rates and delays at Linden would necessarily delay the Company's "product expansion initiatives."

93.     The Prospectus also stated that Blue Apron was already in the process of introducing new products which would help increase the Company's sales and profits:

> ***We are currently in the process of introducing additional product expansions*** to increase both customer flexibility (the ability to select greater or fewer recipes per Order) and the number of recipe options (the ability to choose from a greater number of recipes each week). ***We expect that this product expansion will favorably impact our cumulative net revenue per Customer.***

- 26 -

94.     This statement was false and misleading because the already-materialized adverse OTIF rates and delays at Linden were necessarily delaying any "additional product expansions," and therefore Defendants had no reasonable basis to "expect that this product expansion will favorably impact our cumulative net revenue per Customer" until after the OTIF rates and delays at Linden could be addressed.

95.     With respect to the Company's ability to fulfill orders and achieve operational efficiencies, the IPO Prospectus stated:

> Our strategic investments in our fulfillment center operations will significantly impact our ability to continue to grow our business, introduce new products, increase variety to customers, and create efficiencies in our cost structure. We have made significant investments to scale our operations and support the growth of our business, and we plan to continue this investment. ***In the near term, we plan to further invest in equipping our fulfillment centers with automated portioning and packaging equipment, which we believe will increase our operational efficiency***.

96.     This statement was false and misleading because it stated that the Company had invested in "automated portioning and packaging equipment" and suggested that the Company therefore had a reasonable basis to believe that "further" investments would "increase our operational efficiency." But it failed to disclose that (i) Blue Apron's operational efficiency was actually worsening because the Company was already experiencing adverse OTIF rates as well as significant delays in opening and ramping up production at the Linden facility; and (ii) Defendants therefore had no reasonable basis to project that the Company's operational efficiency would increase in the near term.

## VII.    THE TRUTH BEGINS TO EMERGE

97.     Blue Apron's stock price began dropping almost immediately after the IPO, closing at $9.34 on June 30, 2017; $7.73 on July 7, 2017; and $7.36 on July 14, 2017. By July 21, 2017, Blue Apron's stock price had fallen to $6.55—34.5% below its $10 IPO price.

98.    Before July 24, 2017, only one analyst initiated coverage of Blue Apron: Northcoast Research, which initiated coverage on July 11, 2017 with a Sell rating and a $2 price target, predicting "continued losses" because Blue Apron's "[s]ales growth seems to be dependent at this time upon promotional discounts."

99.    On July 24 and 25, 2017, Blue Apron's underwriters began initiating coverage of Blue Apron. Their price targets ranged from $7 to $14, but all of them expected Blue Apron's stock to rise above its $6.55 closing price on July 21, 2017.

100.    Some of the underwriters were optimistic that Blue Apron would rise above its IPO price, including Canaccord Genuity ($14, buy), SunTrust Robinson Humphrey ($12, buy), Goldman Sachs ($11, buy), and Oppenheimer ($11, outperform). Others expected Blue Apron to return to its IPO price, including Needham ($10), RBC Capital ($10, outperform), Citi ($10, buy), and Stifel Nicolaus (buy, $10 price target).

101.    These analysts' reports confirm the market's understanding, based on the Company's statements in the IPO Prospectus, that Blue Apron's operations were improving, that its new fulfilment centers and planned new product rollouts remained on schedule, and that Blue Apron would therefore be able to address challenges such as increasing competitive pressure.

102.    For example, RBC noted its belief that "APRN is in the midst of expanding its offering to enhance flexibility – different price points, more delivery options and more recipe choices" and that "[i]n our view, the success of this effort is key to whether APRN can re-accelerate growth"—ultimately concluding that Blue Apron's "new product and service initiatives enhance its consumer value proposition and will lead to re-accelerating growth in FY18." Stifel was impressed by the Company's "sophisticated, technology-driven supply chain and logistics network which should support its leading position in the crowded meal kit company

landscape." Goldman Sachs expected Blue Apron to be able to "maintain[] its lead… with more rational economics," including its ability to keep inventory levels down and minimize food waste. Oppenheimer liked Blue Apron's attractive gross margin profile, expected gross margins to continue to improve, and was optimistic that new product offerings would help Blue Apron's customer retention. Raymond James was concerned about "high churn rates, slowing subscriber growth, and marketing deleverage" but was "optimistic that more flexible plans will drive increased order frequency." William Blair was concerned that customer acquisition costs would keep rising due to heavy competition, but was optimistic that Blue Apron's margins would continue to improve due to greater automation.

103.    On July 25, 2017, Blue Apron announced significant "changes to its executive leadership team." Most significantly, co-founder Matthew Wadiak was stepping down from his role as COO and would "transition to serve as a senior advisor" to the Company.

104.    The combination of favorable analyst coverage from the underwriters and the news of Blue Apron's executive restructuring temporarily reassured investors. From July 21 to July 25, Blue Apron's stock rose from $6.55 to $7.50. But on July 26, 2017, it fell again, closing at $6.75. By August 4, 2017, it was down to $5.83.

105.    The full truth emerged on August 10, 2017, when Blue Apron announced its results for the second quarter of 2017, issuing a press release, holding an earnings call, and filing its quarterly report on Form 10-Q for the quarter ended June 30, 2017 (the "2Q 2017 10-Q").

106.    The Company shocked investors by revealing that its much-touted new fulfillment center in Linden, New Jersey—which according to the IPO Prospectus was supposed to be "outfitted with state-of-the-art technology" and "help improve the efficiency and capacity of our operations to meet strong customer demand"—had, according to the 2Q 2017 10-Q, run into

"unexpected complexities and costs…which are adversely affecting our revenue expectations, the rollout of our new product offerings, and our ability to acquire and retain new customers." As Salzberg explained on the earnings call:

Another factor that impacted the second quarter was the timing of our product expansion. As you know, we are currently in the process of rolling out significant changes to our infrastructure both from an operational and technological perspective to allow us to offer a more diverse and personalized product assortment to our customers. The reality is, ***we are behind on this work and that delay impacted our second quarter results as well as our near-term outlook***, which Brad will review shortly.

***Much of the delay is related to the launch of our Linden fulfillment center***, the newest and most automated facility in our network. ***Linden shipped its first delivery on May 15th, but in the second quarter still only represented approximately 3% of our network's national volume***. As we have moved into the third quarter, we are transitioning more volume from our older Jersey City center to Linden, and Linden will represent a larger percentage of our national volume in the back half of the year. ***During this ramp phase, Linden will be operating at a significantly worse margin than our other centers***; however, we still believe that Linden will ultimately become our most efficient center when fully scaled.

***The delay is related to experiencing greater operational complexity than we initially planned for.***

107.    Salzberg also revealed that the Company's OTIF rates had been worsening:

***[W]e are seeing worse OTIF rates*** which impacts – and OTIF, since we haven't used that metric a lot publicly, just so you guys know is on-time in full, and the way we think about that, it's about delivering on-time to the customer, and by in full we mean 100% order completeness. So, a missing ingredient would impact, a mis-pick would impact that, and ***that's actually one of the biggest challenges right now on our OTIF rates, because so much of the process in our fulfillment centers is brand new and the change management associated with training thousands of employees and managers on the new process and getting process compliance is just taking us a little bit longer than we had previously anticipated***. This is the most ambitious organizational change we've made. So, ***when those OTIF rates are suffering, they also impact the order frequency and cadence of those new customers as well***. And so, one of the reasons that ***we are choosing to pull back on marketing in the back half of the year*** is because we are focused on only generating incredible returns on our marketing and when we see drivers in that equation move, we act in terms of managing the business as rapidly as we can, and so that's the impact there.

108.    In response to an analyst question, Salzberg ultimately admitted that *the OTIF problems were not limited to Linden*:

> So *we have seen impact on our OTIF rates across all of our centers because of the roll out of our new infrastructure*. That being said, it is most pronounced in Linden, which is just very newly being ramped right now and it is the most automated and advanced center with the most new people and infrastructure. So there is more impact in Linden then there is in the rest of the country.

109.    Salzberg further admitted during the earnings call that the OTIF metric was incredibly important to the Company's business:

> *We are hyper-focused on maintaining strong performance on metrics like on-time in-full, or OTIF*, to ensure seamless customer experiences and *will be more deliberate in expanding our offerings to customers with the current performance levels*. We know *lower than average OTIF scores directly impact our customer lifetime values, especially for customers early in their lifecycle with us, and we have seen some impact as part of this rollout*. Since *margins and OTIF are both drivers of customer lifetime value*, when they are impacted *it affects the returns on our acquisition marketing as well*. The interconnectedness of these drivers ultimately flows through to growth and financial performance.

110.    As Dickerson further elaborated:

> [T]he *delays we've been having in our product expansion are impacting our ability on the acquisition side to drive incremental revenue through new customers because obviously those offerings are very, very important to attract new customers*, as Matt had talked about. So, that is part of the impact.

> Obviously the challenges in rolling out our product offerings, specifically *challenges in rolling out the Linden facility impacting our OTIF rates also causes some short term concerns with our customer engagement and retention*. Specifically, as Matt mentioned, in newer customers also. That is obviously part of the back half of the year guidance….

> It's really hard to kind of separate how much of this was due to the delay in rollout and the impact of OTIF rates versus the pullback in marketing to some degree, because they're all kind of interconnected to some degree, but I would say that they probably all play a relatively important part of this revenue guidance in the back half of the year with the marketing call down probably, I would say, being the most significant piece of it, but *I don't want to understate the impact of the delay in rolling out our product expansion and also the OTIF rates, which are very, very important.*

111.    Due in part to the Linden delays and the broader OTIF problems, Blue Apron's revenues and customer numbers actually *declined*—a big shock for a newly public company whose net losses were getting worse each year and whose revenue growth had always been primarily driven by customer growth. In the first quarter of 2017, Blue Apron had 1.04 million customers, 4.3 million orders, and $244.1 million in revenue—but in the second quarter, it had only 943,000 customers, 4.0 million orders, and $238.1 million in revenue.

112.    Even worse, the operational challenges and associated expenses were likely to get worse in the third quarter of 2017. Specifically, according to Dickerson, the "majority of the operational pressure is expected in the third quarter as we fully transition from our existing Jersey City center to our new Linden center and increase the velocity of our current product expansion efforts nationally across all our fulfillment centers." The 2Q 2017 10-Q confirmed this, stating that Blue Apron "*expect[ed] increased expenses* driven by the ongoing launch of new infrastructure to support our product expansion initiatives, including *the launch of our new Linden, New Jersey fulfillment center, to continue throughout the remainder of 2017*."

113.    As a result of all this, CFO Brad Dickerson stated during the earnings call that Blue Apron had been forced to "*change[] our strategic approach* in managing the business for the remainder of 2017":

> As Matt mentioned earlier, we are working through unexpected complexities and costs that have arisen with the ongoing launch of our Linden facility as well as our current product expansion initiatives. These complexities have arisen within the last month as we continue to transfer more and more volume from our existing center in Jersey City to our new center in Linden. Currently, our Linden center is approaching the volumes of our other existing centers compared to minimal volume in the second quarter.
>
> In addition to the *significant impact to our near-term labor costs included in cost of goods sold*, these issues are also having a *meaningful impact to our revenue expectations as the delays in rolling out our new product offerings create headwinds to acquisition of new customers and challenges around on-*

***time in full rates impact retention of newer customers***. This recent operational development and its expected near-term effect on net revenue and cost of goods sold, in addition to the smaller raise of capital in our IPO than originally anticipated, has ***changed our strategic approach*** in managing the business for the remainder of 2017.

As Matt mentioned, the interconnectedness of cost of goods sold and on-time in-full and their effects on marketing efficiency are important drivers of financial performance. Because of these factors, ***we will be reducing our marketing spend in the back half of the year*** which will in turn have an ***obvious additional impact to the company's top-line growth***.

114.   Salzberg summarized how the Linden delays and broader OTIF problems had forced Blue Apron to change its strategic approach:

…***the launch of Linden, in particular, has caused our on-time in full rates to be lower than where we are comfortable with***, which is why we are delaying some of that launch and taking it a little more deliberately because we're focused on making sure that all of our customers have seamless customer experiences. So, ***when our OTIF rates are worse than we would like, it does impact early customer lifecycle, lifetime value*** somewhat, and that is one of the reasons why we are being more conservative on acquiring customers during this back half of the year while we are working through completing the launch in a high quality way so that all of our customers always get an incredible experience from Blue Apron.

115.   Notably, the factors Dickerson and Salzberg cited as chief reasons for changing the Company's strategic approach—adverse OTIF rates and persistent delays in opening and ramping up the Linden facility—***were in fact present at the time of the IPO***. Thus the Company must have changed its strategic approach when it was experiencing the OTIF issues and Linden delays leading up to the IPO, not just in August when the Company first publicly revealed the ongoing issues.

116.   As a result of the "changed…strategic approach," the Company had to issue guidance for the remainder of the year that was significantly below what analysts and the market had been led to expect. Blue Apron now expected $380-400 million in revenue, and a net loss of $121-128 million, in the second half of 2017. This was even lower than the $421 million in

revenue that Blue Apron had generated in the second half of 2016. Blue Apron also reduced its guidance with respect to capital expenditures. In the IPO Prospectus, Blue Apron had stated that its "projected remaining capital expenditures are expected to amount to approximately $100.0 million to $180.0 million in the aggregate for 2017 and 2018." But now in the earnings call, Salzberg disclosed that it had decreased to $75 million to $115 million—in part because, given the problems with OTIF and the delays at Linden and the lack of growth in customers, Blue Apron no longer saw an urgent need to complete its planned new fulfillment center in Fairfield, California.

117.    Investors and analysts were blindsided by these revelations. Matthew Levy at *Seeking Alpha*, in fact, described Linden as the "Big Blindside."[11]

118.    Before August 10, 2017, analysts were not expecting operational delays at Linden, worsening OTIF rates, or delays in the Company's planned product expansions.

119.    In fact, *Bloomberg* had reported on August 4, 2017—and Blue Apron had confirmed—that the Company was planning to close its Jersey City center in October 2017 and moving all of its operations to the new Linden center.[12]

120.    As recently as August 8, 2017, RBC had reiterated its $10 price target in a report that mentioned a possible "downside scenario" in which Blue Apron's stock might fall to $5 due to "slower-than-expected growth driven by operational delays at its new Linden, NJ fulfillment

---

[11] *Matthew Levy*, *Why Blue Apron Is Falling: A Q2 Summary*, Seeking Alpha (Aug. 10, 2017 10:32 AM ET), https://seekingalpha.com/article/4097315-blue-apron-falling-q2-summary.

[12] Jing Cao, *Blue Apron Is Closing Facility and Moving 1,270 Jobs*, Bloomberg (Aug. 4, 2017, 11:58   AM   EDT;   corrected   Aug.   4,   2017,   3:35   PM   EDT), https://www.bloomberg.com/news/articles/2017-08-04/blue-apron-plans-to-cut-24-of-staff-barely-a-month-since-ipo.

center and executional missteps related to its planned product expansion initiatives." Notably, based on the information available in the market at the time, RBC **did not consider this risk significant enough to reduce its $10 price target**. Instead, RBC simply stated its understanding that "Management has noted that they expect to complete their Linden, NJ Fulfillment Center and rollout of their planned product expansion in Q3/Q4. The product expansion is central to APRN's growth strategy and we look forward to a progress update."

121.    Analysts and commentators quickly realized that the newly-disclosed problems were a severe setback for Blue Apron—from which the Company might not be able to recover.

122.    The *Motley Fool*[13] was concerned about the "rapid deceleration of growth" and unconvinced by the Company's excuses:

> It can't lean on seasonality as a scapegoat, as revenue moved higher between the first and second quarters of 2015 and 2016. Blue Apron blames the sequential dip, in part, on a planned reduction in marketing spend of $26.1 million between the two periods, but that's only going to make investors think that the dot-com dud was inflating sales ahead of its IPO.
>
> The news only gets worse as we work our way down the income statement's ingredients. Cost of goods sold is growing faster than revenue, which may lead fence-straddlers to wonder if scalability will be enough to drive profit growth in the near term.

123.    As *Recode*[14] aptly summarized:

> One of the clouds hanging over Blue Apron since its IPO has been the looming threat of what an Amazon-Whole Foods combination could mean for its business.

---

[13] Rick Munarriz, *Blue Apron Makes a Brutal First Impression*, Motley Fool (Aug 10, 2017 at 3:23PM),              https://www.fool.com/investing/2017/08/10/blue-apron-makes-a-brutal-first-impression.aspx.

[14] Jason Del Rey, *Blue Apron is stuck in a dangerous cycle that has nothing to do with Amazon*, Recode (Aug 11, 2017, 6:00am EDT), https://www.recode.net/2017/8/11/16127050/blue-apron-q2-earnings-warehouse-issues-linden-new-jersey-matt-salzberg.

But when Blue Apron's stock got hammered on Thursday, falling more than 17 percent by day's end, that had nothing to do with it; *it was the company's disappointing financial forecast for the back half of the year that was the culprit*.

The company is *in the midst of a vicious cycle* that goes something like this: Blue Apron is experiencing warehouse issues that are causing customer satisfaction issues that are causing retention issues that are causing marketing issues that are causing revenue issues.

Got that? Let's go piece by piece, starting at the top.

Blue Apron announced on Thursday that it has encountered "unexpected complexities" with the opening of a new, highly automated warehouse in Linden, N.J., and that the transition from its previous New Jersey warehouse is taking longer than expected. (*This probably explains the exit of the company's co-founder and Chief Operating Officer Matthew Wadiak, which was announced just last month*.)

At the same time, Blue Apron has been adding new technology and processes to its other warehouses that require a lot of training….

The result has been mistakes that are hurting Blue Apron's OTIF rates — that is, the percentage of orders that arrive on time and with all the correct ingredients (in full), the company said. What happens when a new customer tries out Blue Apron for the first time and gets a late delivery or wrong ingredients? Yep, they bail. And when Blue Apron's new customers are bailing at a higher rate than before, Blue Apron's marketing investments become less efficient. Or, said another way, the company wastes marketing dollars.

… But what happens when you plan to aggressively ramp down marketing, from 20 percent of revenue in the first half of the year to around 15 percent in the back half? Your revenue forecasts suffer….

The good news Blue Apron is trying to pitch to investors is that they believe most of the warehouse hurdles are behind them and that the new facility is taking on more and more of the company's volume.

That trend will be crucial, since the company's ability to roll out new product enhancements — like the choice of ordering two meals a week instead of three — is crucial to it building a sustainable business that can retain existing customers and attract new ones affordably.

124.    Accordingly, analysts responded by significantly lowering their price targets or even removing them altogether.

125.    SunTrust *reduced its price target from $12 to $5.50*, emphasizing that "[e]xecution issues (and not competition) caused the slowdown in topline." It elaborated that "APRN has not seen a significant change in the competitive dynamics in recent months," but "slower than expected ramp-up of the new FC in Linden coupled with operational challenges across the 3 fulfillment centers (FCs) as a result of infrastructure upgrades, has caused mgt. to rein in marketing/customer acquisition spending as it works to resolve these issues." SunTrust further noted its concern about "a lack of visibility on timing for a full recovery and costs associated with the effort."

126.    Oppenheimer removed its price target altogether, writing that "[w]hile the issues surrounding the transition to a larger automated fulfillment center in NJ were partially understood, APRN is also seeing On-Time-In-Full (OTIF) issues with its legacy West Coast facility, suggesting scaling challenges greater than anticipated." And Goldman Sachs wrote that "we were clearly wrong in our estimate of the logistical challenges of this transition."

127.    Following this news, Blue Apron stock dropped $1.10 per share or over 17% to close at $5.14 per share on August 10, 2017, a 50% drop from the IPO price.

128.    However, even this reduced price point did not reflect the true value of Blue Apron's stock, as the market continued to learn more about the Company's setbacks in trying to ramp up production.

129.    Over the next few months, Blue Apron struggled to address its operational problems but with limited success, leaving it unable to compete effectively and causing investors to become increasingly impatient.

130.    The Company also continued to struggle with staffing problems. On August 22, 2017, *Bloomberg* reported that Blue Apron had "implemented a temporary hiring freeze of

salaried employees and fired part of its recruiting team just as it ramps up a new fulfillment center that's supposed to help the troubled, newly public company expand." The "fired recruiters included staff who helped find operations and technical employees." Moreover, according to *Bloomberg*, the Company was having "***trouble keeping enough workers on the production lines***, especially at the Jersey City facility"—which was why "***Linden began operating in May, a few months later than originally planned***."[15]

131.    In the meantime, Blue Apron lost market share to its competitors because its operational problems prevented it from competing effectively. By September 2017, Blue Apron's market share was down to 40.3%, compared to 57% in September 2016. Meanwhile, HelloFresh's market share jumped 10% to 28.4%, while Sun Basket's market share doubled to 8%.[16] By October 2017, HelloFresh was telling investors that it had "out executed Blue Apron across all dimensions" and was poised "to overtake our biggest competitor in the near term."

132.    On October 18, 2017, Blue Apron announced that it had eliminated 6% of its workforce in a "company-wide realignment of personnel to support its strategic priorities." According to Salzberg, the layoffs "flowed from the roadmapping and reprioritization exercise that we recently undertook" and were "necessary as we focus the company on future growth and achieving profitability."

---

[15] Jing Cao, *Blue Apron Loses HR Executive, Freezes Hiring amid Expansion*, Bloomberg (Aug. 22, 2017, 2:54 PM EDT; updated on August 22, 2017, 4:05 PM EDT), https://www.bloomberg.com/news/articles/2017-08-22/blue-apron-loses-human-resources-chief-and-starts-hiring-freeze.

[16] Rani Molla, *Blue Apron still dominates the market for meal delivery kits but its market share is plummeting*, Recode (Nov 1, 2017, 10:30am EDT), https://www.recode.net/2017/11/1/16581142/blue-apron-market-share-decline-meal-kit-delivery-hello-fresh.

133.    However, none of this prevented Blue Apron's stock price from continuing to fall, as the market remained concerned about Blue Apron's OTIF rates and its Linden facility. By October 31, 2017, Blue Apron's stock price was down to $4.77—less than half the IPO price. In November 2017, HelloFresh went public on the Frankfurt Stock Exchange with a valuation of $1.6 billion—twice that of Blue Apron—while reporting higher revenue and lower net losses than Blue Apron.

134.    On November 2, 2017, Blue Apron announced its results for the third quarter of 2017, issuing a press release, holding an earnings call, and filing its quarterly report on Form 10-Q for the quarter ended September 30, 2017 (the "3Q 2017 10-Q").

135.    In what appeared to be good news, Blue Apron reported that, after the end of the quarter, the Company had "completed its most recent product expansion to all customers and fully transitioned product volumes to its newly launched east coast fulfillment center in Linden, New Jersey." Blue Apron had also decided not to build out its planned fulfillment center in Fairfield, California.

136.    However, Blue Apron's financial and operating results kept getting worse. Revenues had continued to decline, but operating costs and cost of goods sold had both *increased*, resulting in a much worse net loss.   In addition, Blue Apron continued to lose customers.

137.    Moreover, even though Linden was fully operational and "servicing approximately 50% of our national volume," it was still "*perform[ing] at a margin that was significantly lower than the average of our existing centers*." And, as gradually became clear in the earnings call, the Company's margins and OTIF rates were still so bad that the Company was not willing to "get back to a normal cadence of marketing spend" until they improved. As

Dickerson explained on the earnings call, in response to a question about whether Blue Apron's plan to re-accelerate marketing spend was still "totally conditional on operational improvements and the metrics that you track over the next three or six months":

> …margin is a key driver of this going forward, so the ability for us to continue to work our way through product expansion, and specifically work our way through the Linden transition is really, really important for us relative to the attractiveness of marketing spending growth in the future. So, focus on ***getting OTIF in the right place, focus on getting margin in the right place is really going to be a key driver of our ability to reinvest in marketing and grow our new customer base going forward***.
>
> I can't give you a timeline right now, but what I can tell you is the leading indicator will be our margins getting back to where we would like them to be and, obviously, OTIF getting into a healthy zone too. So, we're excited about the fact that we've fully transitioned both in product expansion and to Linden. That's a great opportunity for us now to start to optimize as we work our way through the rest of this year. We just really have to see how things go the rest of this year to determine what 2018 looks like and when we can start to press the pedal down in marketing investment again based on those metrics.
>
> As far as your question around customer base, and tenure, and so forth, it does go back to marketing again, so obviously, when we pull back on marketing the biggest impact to that will be new customers which will automatically skew you to more tenured customers when you pull back on marketing. So, we saw that in Q3 and we'll see that in Q4, obviously, also, as we talked about in my prepared remarks and ***we're going to be pulling back on marketing even more so in Q4 than Q3 as we continue to focus on OTIF and operational improvements***.

138. Because of the continued need for operational improvements, Blue Apron further reduced its guidance for the year. In August, the Company had projected a net loss of $121-128 million in the second half of 2017. Now, the Company said it expected a net loss of $131-138 million.

139. In response the earnings release, Blue Apron's stock price plummeted 18.6%, from $4.67 on November 1, 2017 to close at $3.80 on November 2, 2017. However, even this reduced price point did not reflect the true value of Blue Apron's stock, as the market continued to learn more about the Company's setbacks in trying to ramp up production.

140.    Analysts and commentators were unimpressed. The *Motley Fool*[17] noted that Blue

Apron wasn't "thinking like a growth company anymore" and had built itself into a catch-22:

> Management wants to expand its profit margin before it ramps up marketing
> again. But to expand its margin, it needs to use the full capacity of its Linden
> center. And it won't get to full capacity unless it adds new customers with
> marketing.
>
> **Margin improvement is an immediate priority**
>
> Blue Apron started pulling back on marketing spend in the second quarter after its
> transition to the Linden facility went worse than anticipated. Problems in the
> transition led to a drop in the "on-time and in-full," or OTIF, delivery of Blue
> Apron's meal kits. Naturally, the lower the OTIF delivery rate, the more
> dissatisfied customers Blue Apron has, and fewer people order a second or third
> time from the company….
>
> [Blue Apron] also lowered its net loss outlook for the second half of the year,
> which doesn't indicate confidence that management will turn around its margins
> in the near future.

141.    SunTrust reduced its price target from $5.50 to $4, noting "low visibility into the

company's 2018 turnaround efforts" and commenting that the Company's planned pullback on

marketing spend was "an acknowledgement that the fulfillment centers and product is not ready

for prime time yet." RBC reduced its price target from $8 to $6. Oppenheimer still refused to set

any price target, opting to "remain on the sidelines given near-term uncertainty in the growth

algorithm amid increasing competition going forward."

142.    Salzberg and Dickerson tried to reassure investors at the RBC Capital Markets

TIMT Conference on November 7, 2017, but to no avail. Analysts were impatient to hear the

Company's progress in Linden and in fixing its OTIF rates and its margins.

---

[17] Adam Levy, *Did Blue Apron Build Itself a Catch-22?*, Motley Fool (Nov 6, 2017 at 12:00PM),
https://www.fool.com/investing/2017/11/06/did-blue-apron-build-itself-a-catch-22.aspx.

143.    Salzberg and Dickerson tried to argue that the Linden fulfillment center had been a worthwhile investment for the Company and that it would eventually become extremely efficient. Instead, they made clear that the Company was still, in fact, far behind what investors had believed with respect to Linden, margins, and OTIF rates.

144.    Asked about Linden, Salzberg responded:

Linden was a big investment for us in terms of building out additional capacity and additional capabilities for our Company. It was an investment in additional food manufacturing capability to drive down our costs, improve our margins, and also allow us to extend and transform our product line to be more flexible for our customers moving forward….

But the same time as we ramped Linden, we had what we have described as an overly optimistic ramp plan and have been incurring additional costs relative to our plan than what we expected there. So now that we have completed that ramp, *we are very focused on getting the margins in Linden to where we expect them to be performing*.

*Today, Linden is performing as our worst margin fulfillment center because it's very new.* It has a lot to do with the new employees at that center. We are training hundreds of new people. We are finishing the implementation and the maintenance and the installation of a lot of new technology and a lot of equipment. Making sure we are getting the full utilization and uptime out of all that equipment is really important to us. And we are working very aggressively to drive the margin improvement there.

145.    Dickerson disclosed how much the Company's margins had worsened in the previous year:

I think if you looked at our history, you saw *in the front half of 2016 you saw margins in the mid-30%s. Now we are coming off a third quarter that was 22% roughly in margins*. So I think if you look at the first and second quarter of 2016, mid-30%s, I think that's a longer-term opportunity for us.

And to Matt's point, the fact that Linden is about half of our national volume and will be the most efficient center, you compare to where we were a couple years ago, I think it shows the longer-term opportunity that we should be actually better than that in the mid-30%s with Linden because it's going to be our most efficient center.

So ***I'd say we are still trying to figure out when that timing is of that***. Obviously, fully transitioning from Jersey City to Linden was a very important first step. Now we can look to optimize and work our way forward. But we do expect that that would be -- over time, that would be our most highly efficient center.

146.    Salzberg admitted that Linden was still "the biggest challenge that we have as a business right now" and that the Company still remained unable to pursue "big opportunities" because it had to focus on fixing Linden's problems:

I think the biggest challenge that we have as a business right now is, very obviously one we've been very transparent with the markets, and it's our Linden fulfillment center. I think almost the entirety of the narrative of our Company since the time we've gone public, which has not been that long ago, is related to our Linden fulfillment center launch.

And because we had experienced some there, we are that right now. And as we rightsize that, we see big opportunities to think about revenue and marketing and the like behind that. Because the interconnectedness of all these components of our business is what drives our financial health.

So when we have good margins, we have better lifetime values. When we have better lifetime values, we can market more aggressively. We can drive more revenue. We can acquire more customers. When we acquire more customers, they refer other customers. And it's a very virtuous cycle. ***And so we are being cautious now because of Linden in particular***.

147.    In response to a frustrated analyst who pressed Dickerson on when exactly Linden would be "fix[ed]," Dickerson admitted that it would probably take "months to some degree" but "it's hard to say at this point in time" and "it won't end all of a sudden overnight."

148.    Investors were not reassured. In response to the new information disclosed on November 7, 2017, Blue Apron's stock price plummeted more than 20%, falling from $3.88 on November 6, 2017 to close at $3.05 on November 7, 2017.

149. The *Motley Fool*[18] blamed the Company for "unforced errors," noted that "[i]f the company had simply maintained its 57% market share from a year ago, revenue would have grown 46% in the third quarter instead of just 3% as the industry continues to expand," and concluded that "the first quarter of 2018 may be its last chance to reinvest in marketing and show that it can grow its market share." Trader Josh Brown told CNBC[19]:

> This is the worst IPO of the year... I've never seen anything like this, where the company becomes public and within a week, they're completely changing the way they do fulfillment. And now they're blaming the cost of shipping out of a new fulfillment center, at the same time that revenue growth collapses. ***This should not have become public***. It looks more like an exit from VCs that just wanted some other hands to take this out of their hands.

150. By November 29, 2017, Blue Apron stock had dropped below $3—70% below its IPO price.

151. On November 30, 2017, after market close, Blue Apron announced that Salzberg had "stepped down from his role as President and Chief Executive Officer" and that Brad Dickerson had taken his place.

152. Many analysts were not impressed. On December 1, 2017, RBC lowered its price target from $6 to $4, explaining:

> We start off by acknowledging that our Outperform call since July 24th at $6.55 has been wrong. We have been arguably overly patient with the company as it attempts to conduct a very challenging execution against a potentially very large market opportunity. Brad Dickerson may very well prove to be a successful CEO,

---

[18] Jeremy Bowman, *Blue Apron Might Be Dying, But Meal Kits Aren't*, Motley Fool (Nov 15, 2017 at 8:32AM), https://www.fool.com/investing/2017/11/15/blue-apron-might-be-dying-but-meal-kits-arent.aspx.

[19] Sarah Whitten, *A new low. Blue Apron falls another 16% as NJ fulfillment center eats away at profits*, CNBC (Nov. 7, 2017 at 11:31 AM ET; updated 1:26 PM), https://www.cnbc.com/2017/11/07/blue-apron-shares-plummet-15-percent-to-new-low-on-cost-concerns.html.

but at the margin *we view the management change as implying less visibility and certainty into APRN's fundamentals*. Frankly, *the level of operational, fundamental and management volatility since its IPO is the most we have witnessed among any Internet stock ... hence the downgrade*.

153.  Investors were temporarily reassured, and Blue Apron stock rose past $4 by mid-December, but it soon declined once more, havering between $3 and $4 in 2018.

## VIII.  THE SECURITIES CLASS ACTION MOTION TO DISMISS IS DENIED

154.  On April 22, 2020, the court in the Securities Class Action denied Defendants' Motion to Dismiss in its entirety, noting that plaintiffs in the Securities Class Action had: (i) "sufficiently alleged defendants were aware of some omitted material facts at the time of the IPO;" (ii) sufficiently alleged a trend under Item 303; and (iii) plausibly alleged that some statements in the IPO Prospectus were misleading.

155.  Faced with the denial of the motion to dismiss in the Securites Class Action, it's a foregone conclusion that defendants will incur millions of dollars in damages resolving the Securities Class Action.  Any amounts paid to the class in the Securities Class Action by the Company in excess of its share is recoverable from its co-defendants.

## IX.  DAMAGES TO BLUE APRON

156.  As a result of Defendants' improprieties, Blue Apron disseminated improper, public statements concerning the Company's business and financial prospects, including the failure to disclose that: (i) Blue Apron was experiencing adverse On-Time In-Full ("OTIF") performance at its production facilities; (ii) significant delays had materialized in opening and ramping up production at the Linden, New Jersey facility; (iii) the adverse OTIF rates and delays at Linden were hindering the Company's customer retention and would necessarily delay the Company's announced plans to add new products, which would be essential to gain new customers and compete effectively in the marketplace; and (iv) because of the adverse OTIF

rates and delays at Linden, Blue Apron had already decided it would be forced to change its strategic approach for the remainder of 2017 by reducing marketing spending until it could address its operational problems and improve its margins and OTIF rates.

157.     Defendants' improper course of conduct has subjected the Company to potentially millions of dollars in damages in connection with the Securities Class Action. The Company stands to incur damage due to any amounts paid to the class in settlement of the Securities Class Action by the Company in excess of its share of liability.

158.     Further, as a direct and proximate result of the IPO Defendants' actions, Blue Apron has expended and will continue to expend significant sums of money.  Such expenditures include, but are not limited to:

(a)     costs incurred in defending and paying any settlements in the Securities Class Action for violations of federal securities laws;

(b)     costs incurred from the Company's internal investigation and review of alleged misconduct;

(c)     costs incurred to investigate wrongdoing; and

(d)     costs incurred from the substantial compensation and benefits paid to the defendants who have breached their duties to Blue Apron.

## X.     DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

159.     Plaintiff brings this action derivatively in the right and for the benefit of Blue Apron to redress injuries suffered, and to be suffered, by Blue Apron as a direct result of violations of securities law by the IPO Defendants.  Blue Apron is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

160.     Plaintiff will adequately and fairly represent the interests of Blue Apron and its stockholders in enforcing and prosecuting Blue Apron's  rights.

161.     Plaintiff is a Blue Apron stockholder, was a stockholder of Blue Apron during the relevant period, and has continuously been a stockholder of Blue Apron.

162.     The current Board of Blue Apron consists of the following Seven individuals: defendants Bradley, Cool, Hirshberg, Kelley, and Salzberg, and non-defendants Huebner and Kozlowski.

163.     Plaintiff has not made any demand on the Board to bring the allegations herein because such a demand would be a futile, wasteful, and useless act, as set forth below.

**Demand Is Excused Because Defendants Salzberg, Bradley, Cool, Hirshberg, and Kelley Face a Substantial Likelihood of Liability for Their Misconduct**

164.     As alleged above, five of the seven current Board members, including Defendants Salzberg, Bradley, Cool, Hirshberg, and Kelley face a substantial likelihood of liability for their misconduct. As more fully detailed herein, Defendants Salzberg, Bradley, Cool, Hirshberg, and Kelley participated and approved the improper IPO Materials in their capacity as Blue Apron directors.   As a result of their access to and review of internal corporate documents, conversations and connections with other corporate officers, employees, and directors, and attendance at management and Board meetings, each of these Defendants knew the adverse, non-public information regarding Blue Apron's business and financial prospects before the issuance of the IPO Materials, yet each failed to prevent its release or correct the misleading and incomplete information contained therein. Moreover, as directors of Blue Apron, these Defendants each had the duty and opportunity to discuss material information with management and fellow directors at any of the Board meetings that occurred before the Company's IPO, as well as at meetings of committees of the Board. Despite these duties, these Defendants caused or

allowed, by their actions or inactions, the improper statements to be disseminated by Blue Apron to the investing public and the Company's shareholders in connection with the IPO.

165.    Accordingly, the above named Defendants face a sufficiently substantial likelihood of liability such as to create a reasonable doubt as to their impartially consider a demand to sue themselves in the present action.

### Demand is Excused as to Non-Defendant Kozlowski

166.    Non-Defendant Kozlowski is the Company's President, CEO, and member of the Board since April 2019.  In her role as CEO of the Company for the fiscal year 2019, Defendant Kozlowski received $2,408,322 in total compensation.   The Company does not claim that Defendant Kozlowski is an independent director and because her primary source of income and primary employment is her employment as President and CEO of Blue Apron and her professional reputation is inextricably bound to her role at Camping World, Defendant Kozlowski is incapable of acting independently and demand is futile upon her.

### COUNT I

### Against the IPO Defendants for Contribution Under Section 11 of the Securities Act

167.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

168.    As a result of the conduct and events alleged above, Blue Apron has been named as a defendant in the Securities Class Action brought on behalf of Blue Apron shareholders in which it is a joint tortfeasor in claims brought under Section 11 of the Securities Act of 1933.

169.    Federal law provides Blue Apron with a cause of action against other alleged joint tortfeasors under Section 11(f).

170.     Accordingly, Plaintiff, on behalf of Blue Apron, hereby claims contribution against the IPO Defendants, each of whom has been named in the currently pending Securities Class Action as a joint tortfeasor with Blue Apron under Section 11, or if joined in such actions, would be liable for the same damages as Blue Apron.

171.     Blue Apron claims no right to indemnification under the federal securities laws from them in this count, but rather only claims contribution.

172.     The plaintiffs in the Securities Class Action allege that the Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

173.     Blue Apron is the registrant for the IPO. The Defendants named herein were responsible for the contents and dissemination of the Registration Statement.

174.     As issuer of the shares, Blue Apron is strictly liable to plaintiffs and the Class for the misstatements and omissions alleged in the Securities Class Action.

175.     The plaintiffs in the Securities Class Action allege that none of the Individual Defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

176.     By reasons of the conduct therein alleged, each Individual Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

177.     The plaintiffs in the Securities Class Action allege that plaintiffs acquired Blue Apron securities pursuant and/or traceable to the Registration Statement for the IPO.

178.    The plaintiffs in the Securities Class Action allege that plaintiffs and the Class have sustained damages. The value of Blue Apron securities has declined substantially due to Defendants' violations.

179.    Accordingly, the IPO Defendants are liable for damages under Section 11(f) of the Securities Act, and, if Blue Apron were to be held liable in the Securities Class Action, the IPO Defendants would be liable to it for contribution.  Plaintiff hereby derivatively claims such right of contribution on behalf of Blue Apron.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff demands judgment in the Company's favor against all Defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of Blue Apron and that Plaintiff is an adequate representative of the Company;

B.    Determining and awarding to Blue Apron the damages sustained by it as a result of the violations set forth above from each of the Defendants, jointly and severally, together with interest thereon;

C.    Directing Blue Apron and Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect Blue Apron and its shareholders from a repeat of the damaging events described herein;

D.    Awarding Blue Apron contribution from the IPO Defendants, and each of them;

E.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

F.    Granting such other and further equitable relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: June 12, 2020                    Respectfully submitted,

                                        By:  /s/ Joshua M. Lifshitz
                                        Joshua M. Lifshitz
                                        Email: jml@jlclasslaw.com
                                        **LIFSHITZ LAW FIRM, P.C.**
                                        821 Franklin Avenue, Suite 209
                                        Garden City, New York 11530
                                        Telephone: (516) 493-9780
                                        Facsimile: (516) 280-7376

                                        *Attorneys for Plaintiff*

**<u>VERIFICATION</u>**

I, Jeffrey Peters hereby declare as follows:


    I am shareholder of APRN and have continuously so owned the Company's common stock during the relevant period. I declare that I am the plaintiff named in the foregoing Shareholder Derivative Complaint ("Complaint"), and know the content thereof; that the pleading is true to my knowledge, except as to those matters stated on information and belief, and that as to such matters I believe to be true.  I declare under penalty of perjury that the foregoing is true and correct.


Executed on 05/14/2020



                                              Signature